**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-18-0000548**
**30-AUG-2019**
**08:53 AM**

NO. CAAP-18-0000548

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
KEVIN LORA, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CRIMINAL NO. 1CPC-17-0000561)

SUMMARY DISPOSITION ORDER
(By: Leonard, Presiding Judge, Reifurth and Chan, JJ.)

Defendant-Appellant Kevin Lora (Lora) appeals from the
Judgment of Conviction and Sentence (Judgment), entered against
him and in favor of Plaintiff-Appellee State of Hawai'i (State)
on June 12, 2018, in the Circuit Court of the First Circuit
(circuit court).[1]  The Judgment was entered pursuant to a jury
verdict finding Lora guilty of one count of sexual assault in the
first degree, in violation of Hawaii Revised Statutes (HRS)
§ 707-730(1)(a) (2014), and one count of sexual assault in the
third degree, in violation of HRS § 707-732(1)(f) (2014).

On appeal, Lora asserts five points of error,
contending that: (1) the circuit court erred in refusing to
sentence Lora as a "young adult defendant" under HRS § 706-667
(2014); (2) the circuit court erred by allowing the State to

---

[1]    The Honorable Rom A. Trader presided.

adduce victim impact testimony from the complaining witness (CW); (3) the circuit court erred by allowing the State to adduce testimony about the content of a security video recording that was not admitted into evidence; (4) the State committed prosecutorial misconduct; and (5) cumulative error warrants a new trial.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments they advance and the issues they raise, as well as the relevant statutory and case law, we resolve Lora's appeal as follows.

(1) Lora argues that the circuit court failed to consider Lora's case on an individualized basis when it declined to sentence him as a "young adult defendant" primarily based on whether or not Lora was violent.

While "[a] sentencing court must consider all sentencing options [and] the trial court would be well advised to state clearly on the record that the alternative sentencing options were considered[,]" State v. Hussein, 122 Hawaiʻi 495, 500-01, 229 P.3d 313, 318-19 (2010) (citations, internal quotation marks, and brackets omitted), "[t]he authority of a trial court to select and determine the severity of a penalty is normally undisturbed on review in the absence of an apparent abuse of discretion or unless applicable statutory or constitutional commands have not been observed." State v. Davia, 87 Hawaiʻi 249, 253, 953 P.2d 1347, 1351 (1998) (citations and internal quotation marks omitted). "Generally, to constitute an abuse it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." Keawe v. State, 79 Hawaiʻi 281, 284, 901 P.2d 481, 484 (1995) (citations and internal quotation marks omitted).

2

Under HRS § 706-667, a sentencing judge is given the discretion to impose special terms of imprisonment for a "young adult defendant."[2]  HRS § 706-667(3) provides:

> A young adult defendant convicted of a felony, in lieu of any other sentence of imprisonment authorized by this chapter, may be sentenced to a special indeterminate term of imprisonment if the court is of the opinion that such special term is adequate for the young adult defendant's correction and rehabilitation and will not jeopardize the protection of the public.  When ordering a special indeterminate term of imprisonment, the court shall impose the maximum length of imprisonment, which shall be eight years for a class A felony, five years for a class B felony, and four years for a class C felony.  The minimum length of imprisonment shall be set by the Hawaii paroling authority in accordance with section 706-669. . During this special indeterminate term, the young adult shall be incarcerated separately from career criminals, when practicable.

At the time of the offenses for which Lora was convicted, Lora was less than twenty-two years old with no criminal history. Lora was therefore eligible for sentencing as a young adult defendant.  The circuit court, however, was not required to treat Lora as a young adult defendant.  The circuit court had the discretion to impose a special indeterminate term of imprisonment if it was "of the opinion that such special term is adequate for the young adult defendant's correction and rehabilitation and will not jeopardize the protection of the public."  HRS § 706-667(3).

The circuit court recognized that Lora met the technical requirements to be considered a young adult defendant but expressly stated that it did not believe that a special term was appropriate in Lora's situation.  The circuit court explained:

> But I divide the world into basically two camps.  I sentence people every single week.  That's probably the most

---

[2]  A "young adult defendant" is defined as

a person convicted of a crime who, at the time of the offense, is less than twenty-two years of age and who has not been previously convicted of a felony as an adult or adjudicated as a juvenile for an offense that would have constituted a felony had the young adult defendant been an adult.

HRS § 706-667(1).

3

> important decision that judges make. And I separate the world in two: Those people that are violent, and those people that aren't.
>
> And in this particular instance, while [defense counsel] has done his best and everybody who cares about you has tried to have the Court focus in on your good qualities -- and you have them. But when people are watching, it is easy to do the right thing. But when you don't think people are watching, people do things that no one would expect them to do. And in this particular case, that is exactly what the Court thinks you did. It may not typify how you've lived the rest of your life.
>
> But in an instant, you chose to get out there, trying to meet some girls, trying to get some action, or whatever you want to call it, and you preyed upon this woman. And you treated her like a piece of garbage, and you left her there on the beach to try to pull together the pieces. And unfortunately, that has blown back on you.

The circuit court cited the nature of the offense, describing it as "a violent, horrific act on [Lora's] part" where Lora "violated [CW] in every horrible way a woman probably could experience." The circuit court also cited the impact that the incident had on CW. The circuit court's division of offenses into "two camps" based on the use of violence reflects the circuit court's consideration of the "protection of the public," as required in HRS § 706-667(3). It was within the circuit court's discretion to opine, based on the specifics of this case, that a specialized term was inadequate for Lora's correction and rehabilitation. On this record, we cannot conclude that the circuit court abused its discretion in declining to sentence Lora as a young adult defendant.

(2) Lora argues that the circuit court erred in allowing CW to testify about how she felt during the post-assault examination and the regrets she had regarding the night of the incident. Specifically, Lora challenges the admission of the following testimony from CW discussing her experience during the post-assault examination:

> Um, the process of a rape collection kit is very dehumanizing. Um, after experiencing the trauma that I had just gone through, I had to stand on a mat and carefully remove all of the clothing that I had on, and I could see all the sand falling onto this mat.
>
> And I had to stand naked in exam room lighting, just completely naked, while someone took pictures of me. I was

> given a gown and a sheet, and I waited for the doctor to arrive.
>
> He explained to me in probably the most compassionate way that he can that a lot of this will be violating, and he apologized upfront for the process.
>
> There were, like, a lot of swabs that were taken from parts of my body where I know that his saliva had been.
>
> There was a vaginal exam, and it's not the kind like you go to the doctor and have one done. It's, like, a very long time with a man looking at me and taking high def pictures of my most personal areas. It was horrible.
>
> . . . .
>
> I was there until 10:00 the next morning. I had to receive prophylactic injections in case that the defendant had diseases.
>
> I took a pregnancy test. I was given oral anti-virals to make sure that I didn't contract hepatitis or HIV, and so for every morning and every night for the next 30 days, I took a pill that made me extremely sick. It's better than getting hepatitis, I guess.

Lora also challenges the admission of CW's response to the State's questioning about what CW wishes she did differently on the night of the incident:

> I have spent two years thinking and pondering of what could have happened differently that night for me, and when I first started, my regrets were, I reget [sic] wearing a skirt. I reget [sic] shaking his hand. I reget [sic] not being able to feel fear and act on it in a way that would protect me.

At trial, Lora objected to CW's testimony in both of these instances on relevancy grounds. The circuit court overruled Lora's objections in both instances.

On appeal, Lora reasserts that this testimony was irrelevant and also argues for the first time that the testimony amounted to victim impact statements that were unduly prejudicial and thus should not have been admitted during the guilt phase of the trial.

"Where the evidentiary ruling at issue concerns admissibility based upon relevance, under [Hawai'i Rules of Evidence (HRE) Rules 401 and 402 (1993)], the proper standard of appellate review is the right/wrong standard." Tabieros v. Clark Equip. Co., 85 Hawai'i 336, 350-51, 944 P.2d 1279, 1293-94 (1997) (brackets omitted) (quoting State v. Arceo, 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996)). Lora's relevance objection did not preserve his claim on appeal that CW's testimony, even if

relevant, constituted victim impact testimony and caused undue prejudice, confusion of the issues, or misled the jury, in violation of HRE Rule 403 (2016). See State v. Moses, 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003) ("As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal[.]"). To the extent Lora claims that CW's testimony constituted victim impact testimony and violated HRE Rule 403, we review this issue for plain error. See Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b).

Lora argues that CW's testimony in both instances had no bearing on any facts of consequence and were thus irrelevant. The only facts of consequence, Lora asserts, were the elements of Lora's charged offenses. Lora contends that HRE Rule 403 was violated because CW's testimony in these instances "tacitly prompt[ed] the jury to hold someone accountable for the dehumanization of [CW], and confuse[d] and misle[d] the jury . . . into believing that the post-offense impact that a crime had on the complainant is something they may legitimately consider when deciding upon the defendant's guilt."

The State responds that CW's testimony regarding how she felt during the post-assault examination was relevant to the issue of whether she was able to accurately provide a medical history to the examining doctor. The State appears to concede that CW's testimony regarding her regrets on the night of the incident was irrelevant. The State argues, however, that any error in allowing this testimony about CW's regrets was harmless.

We first address CW's testimony about how she felt during the post-assault examination. Although this testimony did not provide any direct evidence as to the elements of the charged offenses, it was relevant evidence for the jury to consider in assessing CW's credibility. Throughout trial, defense counsel elicited testimony from various witnesses regarding the number of drinks that CW reported that she drank on the night of the incident. Defense counsel specifically pointed out to the jury

the inconsistencies between the number of drinks that CW reported to the doctor at the post-assault examination, to HPD officers, and to the grand jury, as part of his larger argument during closing arguments that CW lied about the assault. CW's emotional state during the post-assault examination provided a possible explanation for the inconsistencies and thus was relevant for the State to support CW's credibility and undermine defense counsel's portrayal of CW as a liar. CW's testimony about her experience during the post-assault examination also provided relevant evidence for the jury to infer possible reasons for a person to voluntarily undergo the examination. The circuit court did not err in overruling Lora's relevance objection to this testimony.

In absence of an objection at trial to CW's testimony regarding the post-assault examination on HRE Rule 403 grounds, we are faced with determining whether it was plain error for the circuit court not to have intervened and sua sponte conduct an HRE Rule 403 balancing analysis. We cannot say that CW's testimony was so inflammatory as to require the circuit court to sua sponte conduct an HRE Rule 403 analysis and to rule that the danger of unfair prejudice outweighed the testimony's probative value. Accordingly, the circuit court did not err when it allowed CW to testify about the post-assault examination.

Regarding CW's testimony about her regrets of the night of the incident, we conclude that it was irrelevant as CW's regrets in hindsight did not make it more or less probable that Lora sexually assaulted CW nor did it weigh on any other facts of consequence. See HRE Rule 401. The circuit court therefore erred in allowing the testimony over Lora's relevance objection.

Having concluded that the admission of this testimony regarding CW's regrets was in error, we must determine whether the erroneous admission of this testimony was harmless. In making this determination,

> [e]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in light of the entire proceedings and given the effect to which the whole

7

> record shows it is entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction. If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

State v. McCrory, 104 Hawaiʻi 203, 210, 87 P.3d 275, 282 (2004) (emphases omitted) (quoting State v. Gano, 92 Hawaiʻi 161, 176, 988 P.2d 1153, 1168 (1999)).

CW's statements regarding her regrets were brief and constituted only a small portion of her entire testimony and of the overall trial. The remainder of CW's testimony provided substantial evidence against Lora. Additionally, CW's testimony about her regrets did not become a feature of the trial and neither the State nor defense counsel emphasized it or further referred to it in closing arguments. On this record, we cannot conclude that there was a reasonable possibility that the admission of CW's testimony regarding her regrets on the night of the incident might have contributed to Lora's conviction. We therefore conclude that any potential prejudicial effect of this testimony was inconsequential and that the circuit court's error in allowing this testimony was harmless beyond a reasonable doubt.

(3) Lora argues that, where there was conflicting testimony regarding the contents of a security video recording that was not in evidence, the probative value of the testimony was outweighed by the danger of unfair prejudice of not having the actual recording in evidence, in violation of HRE Rule 403.

The State called two witnesses from the Honolulu Police Department (HPD), Officer Tricenn Rivera and Detective David Yamamoto, who testified as to the contents of a video recording from a surveillance camera of a hotel in proximity to where the

incident occurred. The video recording was never recovered by police and thus could not be admitted into evidence.[3]

Officer Rivera described the security footage as depicting a man and woman walking towards the beach, engaged in conversation. After a few minutes, the male appears "sprinting" up the street by himself. After another few minutes, the woman emerges and appears to "flag[] down a passerbyer [sic]." Officer Rivera testified that he was able to identify CW as the woman on the security footage based on her clothing and physical features. Officer Rivera also testified that the clothing and build of the male in the video matched CW's description of her assailant.

Detective Yamamoto testified that the video recording that he saw depicted two people but that there were "no real identifying features." When asked whether he recalled seeing an individual sprinting from the scene, Detective Yamamoto responded, "That was not on the video[.]"

Lora did not raise any objections to Officer Rivera's or Detective Yamamoto's testimony regarding the surveillance video recordings. Accordingly, we review this contention on appeal for plain error. See HRPP Rule 52(b).

We fail to see how the admission of both of these witnesses' testimonies results in undue prejudice to Lora. In the absence of the actual video recording, their testimonies were the best evidence of the surveillance video's contents. HRE Rule 1004 (2016). Disputed evidence is not meritless simply because it is disputed. To the extent that these conflicting testimonies

---

[3]     Officer Rivera testified that when he went to the hotel to review the surveillance footage on the day of the incident, he was unable to receive a copy of the video recording because the hotel representative who had authority to release the footage was not in at the time. Officer Rivera testified that it was another individual's responsibility to follow up on recovering the surveillance recording.
Detective Yamamoto testified that he remembered watching the surveillance video recording but did not remember when or where he watched the video. Based upon his memory of having seen the video, Detective Yamamoto had believed that the video was taken into evidence. Upon learning that the video recording was not received in evidence, Detective Yamamoto attempted to obtain the surveillance footage from hotel security on July 6, 2017. At that point, Detective Yamamoto was unable to recover the video recording from hotel security.

create an issue of fact, that issue is in the province of the jury to assess the credibility of the witnesses and weigh the evidence. State v. Kikuta, 125 Hawai'i 78, 89, 253 P.3d 639, 650 (2011).

We therefore conclude that the circuit court did not plainly err in allowing Officer Rivera and Detective Yamamoto to testify as to the surveillance video recordings.

(4) Lora argues that the deputy prosecuting attorney (DPA) committed prosecutorial misconduct during her opening statement, closing argument, and rebuttal argument. In determining whether the alleged prosecutorial misconduct rises to the level of reversible error, we consider three factors: (1) the nature of the alleged misconduct; (2) the promptness or lack of a curative instruction; and (3) the strength or weakness of the evidence against the defendant. State v. Austin, 143 Hawai'i 18, 40, 422 P.3d 18, 40 (2018) (citing State v. Clark, 83 Hawai'i 289, 304, 926 P.2d 194, 209 (1996)). Because Lora did not object to the DPA's alleged misconduct at trial, we must determine whether the alleged misconduct constituted plain error that affected Lora's substantial rights. Id. (citing State v. Wakisaka, 102 Hawai'i 504, 513, 78 P.3d 317, 326 (2003)). We thus conduct a two-step analysis:

> First, we determine whether the prosecutor's actions constituted misconduct. If we conclude that the prosecutor's actions were improper, we analyze whether the action affected the defendant's substantial rights, such that the circuit court plainly erred by not intervening and taking remedial action.

Id. (internal citations omitted).

Opening Statement

"An opening statement merely provides an opportunity for counsel to advise an[d] outline for the jury, the facts and questions in the matter before them." State v. Sanchez, 82 Hawai'i 517, 528, 923 P.2d 934, 945 (App. 1996) (quoting State v. Simpson, 64 Haw. 363, 369, 641 P.2d 320, 324 (1982)).

10

Accordingly, an attorney's opening statement "is not an occasion for argument." Id. (citation omitted).

> Ordinarily, "the scope and extent of the opening statement is left to the sound discretion of the trial judge." However, the trial court should "exclude irrelevant facts and stop argument if it occurs." The State should only refer in the opening statement to evidence that it has "a genuine good-faith belief" will be produced at trial.

Id. (internal citations omitted).

The first challenged portion of the DPA's opening statement proceeded as follows:

> Sun, sand and fun. That's what [CW] expected when she came to Honolulu in May 2016. Instead, her trip to Hawaii ended up being her worst nightmare, a blur of visits to the police station and hospital.
> But how did [CW]'s trip take such a complete turn? During this trial, you will learn about what happened and what led up to May 15th, 2016, and what led up to [CW] leaving Oahu with an unexpected and horrific set of memories burned into her brain.
> In May 2016, [CW] was going on a girls' trip. Her fiance Kenny and her three kids would not be coming along. It would be a time for her to relax and enjoy time with her sister Heather, as well as her friend Haley.
> And for the first few days, the women went sightseeing, visited different beaches around the islands. They even challenged themselves to hiking up Koko Head. And on May 14, 2016, the women were sore from the hike and wanted to do something relaxing.
> And after snorkeling for most of the day at Electric Beach, [CW] and the two other women decided to walk around the Waikiki strip that evening, little shopping, get something to eat.
> They first went to Top of Waikiki. Unfortunately, they found themselves a little under-dressed for that location, and all three women eventually found themselves at Playbar, a small nightclub of sorts on the Waikiki strip.
> But one by one that night, the numbers dwindled. Heather, [CW]'s sister left first. She went back to the hotel room sometime around 11:30 p.m. that night.
> Around 1:30 a.m. Haley decides to leave Playbar as well, and it became just [CW] at Playbar hanging out with some people that she had just met and was having fun with.
> And while [CW] was hanging out with her new friends at Playbar, Haley was walking the couple blocks from Playbar back to their hotel, and that's the Aqua Pacific Monarch hotel, and during that walk, Haley was approached by a male who introduced himself to her as Dominick.
> And the small talk lasted throughout that walk, until Haley got back to the hotel room, and that small talk went well enough that Haley ended giving Dominick her phone number.
> Haley went up to her room, thought about it, and she felt she wasn't actually that tired, and persuaded by Dominick to come back down, meet him in the lobby, go for walk down on the beach.

11

Things continued to click between the male, Dominick, and Haley. Haley ends up kissing Dominick on the moonlight night on Waikiki beach, but when Dominick tried to go beyond just kissing, Haley put the brakes on. She asked him to stop, and after a little push back from Dominick, Dominick respects her decision and ends up walking her back to her hotel.

Haley returns to her hotel room and falls asleep. Now, when it's around 2:30 a.m. on May 15, 2016, [CW] is ready to leave Playbar, and she's ready to walk back to her hotel as well, where her sister and Haley are waiting.

And so she's making that couple-blocks walk down Kuhio Avenue, and when she reaches the vicinity of the hotel, she was also approached by a stranger, a male who introduced himself to her as Dominick, and after Dominick rapid fires questions with her, making that same small talk, Dominick insists to [CW] that they were also going to go for a walk on the beach.

Now, throughout this trip, [CW] had been enjoying the friendliness and courtesy of people of Hawaii, and she was a tourist in vacation mode. Her guard was down, and she allowed herself to walk with this male down the street.

But [CW] immediately regretted this decision, as the male's demeanor changed and took a threatening turn.

His tone and demeanor became aggressive, and he took physical hold of [CW] as they walked down the street. [CW], confused, kind of in shock about what was happening and how this encounter was turning out.

They now end up at the beach. [CW] and the male end up standing on a ledge of a seawall. [CW] was left between the ocean in front of her and the male behind her.

Now she's exhausted from her evening, exhausted from the hike the day before. She was drinking, somewhat intoxicated. [CW] was not confident in her ability at that moment to run away, to run away in the sand, nevertheless, and the male sees this opportunity and pushed [CW] down on to that wall.

The male grabbed [CW]'s hand and forced her hand to touch his penis over his clothes, but that was just the beginning, as the male used physical force to hold [CW] down while he penetrated her vagina with her [sic] penis, all while [CW] was crying and begging the defendant to stop, telling him, she did not want this.

Lora also challenges the following remarks in the DPA's opening statement:

Defendant had been rejected that night, and when he was rejected by Haley earlier, it made him desperate. His failed attempt with Haley fueled his frustration with [CW] that night.

There was no time for romance. He was going to get what he wanted by any means. There was no time for permission, and physical force, if needed, so be it, and that's how [CW]'s trip took a complete 180, because the defendant didn't care about consent.

Lora first asserts that "the prosecutor provided a lengthy, argumentative narration of the crimes, presenting them

as established, historical fact, rather than as what the evidence would show or what she expected to prove." Lora contends that this presentation "bolstered [CW's] credibility and vouched for the veracity of her story about what occurred."

In the beginning of the DPA's opening statement, the DPA remarked to the jury, "During this trial, you will learn about what happened and what led up to [the incident on] May 15th, 2016[.]" The subsequent narrative of the incident, and the events leading up to it, did not constitute improper argument, as it was comprised of facts and evidence that the State intended to adduce at trial, namely though CW's testimony. Furthermore, we do not find that these remarks bolstered and vouched for CW's testimony.

On the other hand, we conclude that the DPA's remarks that Lora was "rejected" and "desperate," that "[h]is failed attempt with Haley fueled his frustration" with CW, and that Lora "was going to get what he wanted by any means" and "didn't care about consent" constituted argument that was improper in an opening statement. We thus must determine whether these remarks affected Lora's substantial rights so as to amount to plain error.

Before opening statements began, the circuit court instructed the jury that "[w]hat the attorneys say during this phase is not evidence" and that the purpose of opening statement is to "share with [the jury] about what the evidence they believe will show." The circuit court also reiterated during its general instructions to the jury before closing arguments: "Statements or arguments made by lawyers are not evidence. You should consider their arguments to you, but you are not bound by their memory or interpretation of the evidence."

As to the strength or weakness' of the evidence against Lora, we recognize that this is not a case where the evidence of guilt was overwhelming. Cf. State v. Veikoso, 126 Hawai'i 267, 282, 270 P.3d 997, 1012 (2011) (concluding that there was

13

overwhelming and compelling evidence of defendant's guilt such that errors in admitting an expert's testimony may be deemed harmless); State v. Uyesugi, 100 Hawai'i 442, 461, 60 P.3d 843, 862 (2002) (concluding that any error in admitting the testimony of a murder victim's family members was harmless because other evidence of the defendant's guilt was overwhelming); State v. Toyomura, 80 Hawai'i 8, 27, 904 P.2d 893, 912 (1995) ("Where there is a wealth of overwhelming and compelling evidence tending to show the defendant guilty beyond a reasonable doubt, errors in the admission or exclusion of evidence are deemed harmless." (internal quotation marks omitted) (quoting State v. Nakamura, 65 Haw. 74, 80, 648 P.2d 183, 187 (1982))). Nonetheless, upon a review of the totality of the evidentiary records, we do not believe the evidence against Lora was so weak as to weigh in favor of finding the DPA's improper remarks prejudicially harmful.

In light of the jury instructions and the general presumption that juries follow the court's instructions, State v. Klinge, 92 Hawai'i 577, 592, 994 P.2d 509, 524 (2000), we conclude that the DPA's argumentative remarks in opening statement were harmless beyond a reasonable doubt and did not affect Lora's substantial rights so as to amount to plain error.

Lora further asserts that the DPA's opening statement amounted to an expression of the DPA's personal belief that CW's story was true and credible and is in that way similar to State v. Marsh, 68 Haw. 659, 728 P.2d 1301 (1986). The prosecutor in Marsh repeatedly used the personal pronoun "I" in stating her personal opinion and expressed on at least nine occasions her belief that defense witnesses had lied. Id. at 660, 728 P.2d at 1302. The Hawai'i Supreme Court held that, because the "pivotal issue was the credibility of the witnesses[,]" the prosecutor's remarks constituted misconduct that amounted to plain error, "[i]n light of the inconclusive evidence against Marsh, the particularly egregious misconduct of the prosecutor in presenting

14

her personal views on the dispositive issues, and the lack of a prompt jury instruction specifically directed to the prosecutor's closing remarks[.]" Id.

Here, we find no language in the DPA's opening statement indicating that the DPA was expressing her personal opinions that CW's testimony was true and credible. The DPA's remarks do not fall within the type of "particularly egregious" conduct rejected in Marsh, id. at 661, 728 P.2d at 1303, and thus were not improper expressions of personal opinion.

We conclude that although a portion of the DPA's opening statement was improper argument, the remarks were harmless beyond a reasonable doubt and did not affect Lora's substantial rights. Therefore, the circuit court did not plainly err by not intervening and taking corrective action during the DPA's opening statement.

### Closing Arguments

During closing arguments,

> a prosecutor is permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence. In other words, closing argument affords the prosecution (as well as the defense) the opportunity to persuade the jury that its theory of the case is valid, based upon the evidence adduced and all reasonable inferences that can be drawn therefrom.

State v. Rogan, 91 Hawaiʻi 405, 412-13, 984 P.2d 1231, 1238-39 (1999) (citations and internal quotation marks omitted).

Lora asserts that the DPA expressed her personal opinion and appealed to facts that were not in evidence when she made the following remarks:

- Regarding CW's testimony, stating that "[y]ou cannot fake that kind of deep sobbing, the kind where you can barely breathe, at times, the kind that it feels like it doesn't stop."

- CW was "reliving that sexual assault" while she testified and then, during cross-examination, was "attacked for all the decisions" she had made.

15

- CW engaged in "self-blame" while she testified.

- CW's conduct on the night of the incident was "out of character for her[.]"

- CW had gone "through all of her memories for the [last] two years[.]"

- The beach was empty at the time of the incident and "[i]f there were additional witnesses on the beach, they wouldn't want to get wrangled into talking to police officers or having to come to court."

- It would take "near miracles from the police" to find witnesses based on general descriptions because "this is Waikiki. People are moving in and out of this area constantly as tourists, transients, what have you."

- The unavailability of the surveillance video recording did not "really matter in the end because the surveillance video wouldn't have exonerated the defendant, wouldn't have changed anything."

First, we find no language in any of these remarks indicating that the DPA was expressing her personal opinion. Further, upon review of the record, we conclude that these statements by the DPA throughout closing arguments were based on reasonable inferences permissibly drawn from the evidence adduced at trial. Clark, 83 Hawaiʻi at 304, 926 P.2d at 209. Thus, these remarks did not constitute misconduct and we need not reach plain error.

Lora also asserts that the DPA improperly bolstered and vouched for CW's testimony when the DPA remarked: "At each stage in this proceeding, [CW] complied with what was being asked of her." Lora argues that this remark "bolstered [CW] by urging the jury to conclude that [CW] was generally compliant, while tacitly implying she was all the more easily duped by Lora into going with him." Lora mischaracterizes the DPA's remark and ignores the context in which it was made. Prior to making this remark, the DPA pointed out to the jury that "the instructions tell you to consider whether any inconsistencies are of importance or unimportant detail, and many of the so-called inconsistencies

16

that defense counsel tried to elicit from [CW] are of minute importance or understandable within the context." Viewed in context, it appears that the DPA's remark about CW's compliance was to provide a reason or explanation for the alleged inconsistencies in the statements CW made during the investigation and then during the judicial proceedings. The DPA argued that CW was simply "answer[ing] questions being asked of her, no further details." The DPA's arguments regarding CW's credibility were based on reasonable inferences permissibly drawn from the evidence adduced at trial. Clark, 83 Hawai'i at 304, 926 P.2d at 209. Therefore, these remarks did not constitute misconduct and we need not reach plain error.

Lora also asserts that the DPA improperly focused the jury on CW's victim impact testimony, which effectively asked the jury to place themselves in CW's position. We do not agree that the DPA's summary narrative of CW's testimony amounted to asking the jury to place themselves in CW's position. Viewed in context, it appears that the DPA reiterated CW's testimony with the purpose of arguing that CW was a credible witness because she was able to recall specific details about the incident. Such remarks do not constitute misconduct and we need not address plain error.

Lora also asserts that the DPA improperly remarked that CW had "no interest in the outcome of this case." Lora argues that this was improper because "[a] purported victim certainly has an interest in seeing her claimed attacker convicted and her claim vindicated[.]" However, Lora does not cite to any authority in support of his claim that the DPA's argument was improper, and we find none.

It is widely recognized that a witness's self-interest is a relevant factor to consider in assessing the witness's credibility. See HRE Rule 609.1 (2016) ("The credibility of a witness may be attacked by evidence of bias, interest, or motive."); see also State v. Estrada, 69 Haw. 204, 220, 738 P.2d

17

812, 823 (1987) ("Bias, interest, or motive is always relevant[.]"). Furthermore, the circuit court instructed the jury: "In evaluating the weight and credibility of a witness's testimony, you may consider . . . the witness's interest, if any, in the result of this case[.]" The DPA's remark arose in the context of the larger argument that the jury should find that CW was a credible witness based on the various factors relevant to the jury's assessment of credibility. Thus, the DPA's remark was within the latitude given to prosecutors to infer and argue, based on the evidence presented at trial, that CW was credible.

Lora further asserts that the DPA improperly commented on Lora's decision not to testify. The DPA remarked: "Only [CW] and the defendant know what happened between them. What happened in those moments, a frenzied struggle and ultimately the violation of [CW]'s body." Lora argues that this remark was comparable to the prosecutor's remark in Wakisaka, which the Hawaiʻi Supreme Court found to be an improper comment on the defendant's failure to testify. 102 Hawaiʻi at 516, 78 P.3d at 329.

In Wakisaka, the prosecutor remarked during closing arguments: "Who was alone with [CW]? [The defendant] was alone with her. He was there. He would know. If he doesn't tell us, we can only look to [CW] and see what her body tells us." Id. at 515-16, 78 P.3d at 328-29. The supreme court held that the prosecutor's remark was improper because it "remind[ed] the jury that [the defendant] did not testify" and "impl[ied] that [the defendant] had information he was withholding from the jury[.]" Id. at 516, 78 P.3d at 329.

Lora argues that the DPA's remark that "[o]nly [CW] and the defendant know what happened between them" similarly invited the jury to note that Lora had information about the incident but declined to testify. Upon review of the record, it appears that the DPA made this comment in the context of arguing that CW's testimony was credible and that, if believed, CW's testimony by

18

itself can be sufficient to prove a fact. In this context, the DPA's remarks did not involve language that was "manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." State v. Valdivia, 95 Hawai'i 465, 482, 24 P.3d 661, 678 (2001) (internal quotation marks omitted) (quoting State v. Padilla, 57 Haw. 150, 158, 552 P.2d 357, 363 (1976)).

Rebuttal Arguments

Regarding the DPA's rebuttal arguments, Lora asserts that the DPA expressed her personal opinion and bolstered CW's credibility by emphasizing CW's impact testimony. The DPA remarked:

> She still went through that sexual assault exam. She still endured having to take medication for weeks. She still endured having to fly to Hawaii twice, take time out of her life to sit there, relive her assault and be attacked for every decision that she made and action that she did or didn't do. She went through all of that with absolutely nothing to gain.

The DPA also remarked that CW's "gut, emotional reaction to every single officer that saw her thereafter, that that emotional reaction that lasted hours through the exam" was not concocted and CW would "have to be the best actress in the world" to fake such a reaction.

We find no indication that the DPA was expressing her personal opinion when she made these remarks. It appears that the DPA was responding to defense counsel's assertion during Lora's closing argument that CW lied about the assault.[4] The DPA's remarks were thus within the wide latitude prosecutors have in rebuttal to respond to defense counsel's arguments attacking CW's credibility raised in closing argument. See Austin, 143 Hawai'i at 47, 422 P.3d at 47. Therefore, these remarks did not constitute misconduct and we need not reach plain error.

_____

[4] During closing argument, defense counsel's overarching argument was: "[CW's] story that she was sexually assaulted by [Lora] is a lie. It's just a plain and simple lie."

19

Lora also contends that the DPA expressed her personal opinion that bolstered CW's credibility and disparaged defense counsel when the DPA remarked that, "[j]ust like [CW] said, clearly [defense counsel] has never experienced trauma." Upon our review of the record, it appears that the DPA's comment was most likely in reference to exchanges made between defense counsel and CW during cross-examination and recross-examination. The first exchange arose when defense counsel cross-examined CW regarding an allegation she made during direct examination testimony that CW had not previously mentioned at any of the interviews with law enforcement or at the grand jury proceeding:

> Q. But you did not tell Detective Yamamoto that Kevin Lora said, Let's give this bum a show, or Dominick said, Let's give this bum a show. Never mentioned that to him?
> A. I'd like to explain. I don't know.
> Q. Sure, sure, absolutely.
> A. The interview with Detective Yamamoto was 15 hours, like you've said in this testimony, after an incredible amount of trauma. The details that I provided to him were the best that I could give him at that time.
> Medically, details from trauma will continue to come back to you hours, days, months, after you experience something that I went through with your client, sir.

CW similarly commented on her perception that defense counsel had never experienced terror, during defense counsel's recross-examination:

> Q. Okay. If you were frozen, how did you move?
> A. Your question to me let's [sic] me know that you've never been terrified in your life.
> Q. Okay.
> A. Absolutely terrified, to the point where you can think 100 million different ways to move, to get out, to scream, to help, and it's paralyzing.
> Q. Okay.
> A. So when I'm frozen, I say that I'm frozen. Of course, there's movement. I'm saying that as a statement of shock, statement of being unable to do what I'm telling my body to do.

Again, we find no indication that the DPA was expressing her personal opinion when she made the remark regarding defense counsel not having experienced trauma, nor do we find that the remark improperly bolstered CW's testimony. We also conclude that the remark could not be interpreted as an attack on the integrity of defense counsel and is not of a disparaging nature.

See Klinge, 92 Hawai'i at 595, 994 P.2d at 527. Rather, we conclude that the DPA's remark was properly within the wide latitude prosecutors have in rebuttal closing to respond to defense counsel's arguments attacking CW's credibility raised in closing argument. See Austin, 143 Hawai'i at 47, 422 P.3d at 47. Accordingly, we need not address plain error.

(5) Lora argues that the cumulative effect of the alleged errors discussed *supra* warrants a new trial. Although we have concluded that the circuit court erred in certain instances, after reviewing the record as a whole, we conclude that each error was insubstantial and thus we need not address their alleged cumulative effect. See State v. Samuel, 74 Haw. 141, 159, 838 P.2d 1374, 1383 (1992) (declining to address the cumulative effect of errors where each alleged error was individually insubstantial).

Based on the foregoing, we affirm the Judgment of Conviction and Sentence, entered on June 12, 2018, in the Circuit Court of the First Circuit.

DATED: Honolulu, Hawai'i, **August 30, 2019.**

On the briefs:

Emmanuel v. Tipon,
(Bileck & Tipon),
for Defendant-Appellant.

Stephen K. Tsushima,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.

Presiding Judge

Associate Judge

Associate Judge

21